UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYNERGEN INC.,

     Plaintiff,

v.

FCA US LLC,

     Defendant.

Case No. 16-cv-11842
Hon. Matthew F. Leitman

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 114)

In 2011, Defendant FCA US LLC ("FCA") contracted to purchase fuel pump control modules ("FPCMs") from Nartron Corporation. The relationship between the entities soured, and Nartron accused FCA of breaching the parties' contract. Nartron then assigned its claims against FCA to Plaintiff Synergen Inc. ("Synergen"), and Synergen filed this breach of contract action against FCA.

Synergen and FCA disagree about which documents comprise the governing contract between FCA and Nartron. On May 15, 2019, FCA filed a Motion for Partial Summary Judgment (ECF No. 114) on that issue. FCA seeks a ruling that its purchase orders – and the standard terms and conditions that were incorporated into those orders – constitute the governing contract. For the reasons explained below,

the Court cannot conclude as a matter of law that the documents identified by FCA comprise the governing contract. Therefore, the Court **DENIES** FCA's motion.

**I**

**A**

In 2011, FCA issued a Request for Quotation seeking quotes for FPCMs for its Dodge Ram trucks.[1] (*See* FCA Head of Powertrain Electrical Components Razzaaq McConner Decl. ¶ 3, ECF No. 114-7, PageID.3064.) In response, on February 22, 2011, Nartron submitted to FCA a document titled "Quotation" and bearing the words "Estimate No. 711104.10" (the "Quote"). (*See* Quote, ECF No. 115-5, PageID.3251–3253.) The key elements of the Quote are as follows:

- **Pricing**: $11.82 per FPCM for the 2013 model year, $11.58 per FPCM for the 2014 model year, and $11.35 per FPCM for the 2015 model year. (*See id.*, PageID.3251.)

- **Quantity**: 243,182 FPCMs per year for the 2013 model year, 162,155 FPCMs per year for the 2014 model year, and 144,679 FPCMs per year for the 2015 model year. Nartron based these quantities on a "volume assumption of 550,016 units minimum over a three year period." (*Id.*)

- **Delivery**: 4,000 FPCMs per shipment. (*See id.*)

- **Tooling**: The Quote included a "Tooling" line item for $610,295. (*Id.*)

---

[1] FCA was formerly known as "Chrysler Group LLC" until it changed its name on December 15, 2014. (*See* Mot. for Partial Summ. J. at 1 n.2, ECF No. 114, PageID.2947.) For the purpose of this Opinion, the Court will refer to both Chrysler Group LLC and FCA as "FCA."

- **Engineering, Research, and Development**: The Quote included a "Project completion (includes on site engineer)" line item for $1,098,938. (*Id.*)

- **"Subject to change" language**: The Quote noted that it was "subject to change based on the requirements of the final approved Chrysler specification." (*Id.*)

- **Payment Terms**: "On Approved Credit," "1/2% - 10 Days, Net 30," and "Tooling Due at Billing." (*Id.*)

- **Terms and Conditions**: The Quote said that "Nartron's agreement to sell the goods to buyer is expressly conditional on buyer's agreement to these terms and conditions and those on the reverse side hereof. And no additional or different terms stated in any purchase order or other form utilized by buyer shall become part of the contract for sale unless specifically agreed to by Nartron in a writing signed by its authorized officer." (*Id.*)

- **Forum-Selection Clause**: Nartron's terms and conditions that were incorporated into the Quote included a forum-selection clause requiring all disputes to be litigated in a state or federal court with jurisdiction over Osceola County, Michigan. (*See id.*, PageID.3252.)

- **Rejection of FCA's Terms and Conditions**: The Quote said that it "contains all of the terms and conditions of the contract between Seller and Buyer. . . . Terms contained in Buyer's orders are expressly rejected and shall not bind Seller or invalidate any terms contained herein. Terms and conditions shall not be modified except upon Seller['s] written request and full Agreement therewith." (*Id.*)

On March 14, 2011, FCA asked Nartron to revise the quantity figures in the Quote "to be equally 243,182 [FPCMs per] year." (3/14/11 Email Regarding

Volume Change, ECF No. 131-12.)  The same day, Nartron revised and amended the Quote, which it labeled with a new estimate number.[2] (*See* Revised Quote, ECF No. 131-13.)  Nartron revised the Quote to have the following price and quantity terms: $11.82 per FPCM and 243,182 FPCMs per year for the 2013 model year, $11.55 per FPCM and 243,182 FPCMs per year for the 2014 model year, and $11.26 per FPCM and 243,182 FPCMs per year for the 2015 model year.

On April 25, 2011, FCA notified Nartron that it would soon issue purchase orders to Nartron in response to the Quote. (*See* 4/25/11 Email, ECF No. 131-15.) Instead of issuing a single purchase order, FCA issued three purchase orders covering the items listed in the Quote: one for FPCMs; one for tooling; and one for engineering, research, and development.

On April 27, 2011, FCA issued its purchase order for the FPCMs (the "FPCM Purchase Order"). (*See* FPCM Purchase Order, ECF No. 114-9.)  The key elements of the FPCM Purchase Order are as follows:

- **Pricing**: $11.82 per FPCM. (*See id.*, PageID.3095.)
- **Quantity**: "[A]pproximately 65-100%" of FCA's plant requirements. (*See id.*, PageID.3094–3095.)
- **Duration**: "[B]eginning 2013 model year and continuing on a year to year basis thereafter." (*Id.*, PageID.3095.)

---

[2] For the purposes of the analysis that follows, the Court refers to the Nartron quotations, collectively, as "the Quote" because the Court's analysis does not turn on any difference between the quotations or the timing of the quotations.

- **Cancellation**: "This purchase order is automatically cancelled at no cost to Chrysler if no releases are issued under this order during any twelve-month period." (*Id.*)

- **Excess Delivery**: "In the event shipments are made in excess . . . purchaser will analyze and evaluate the extra cost of storing, protecting, and documenting such excess, and reserves the right . . . either to return the excess to seller to debit seller for the penalty cost resulting therefrom." (*Id.*, PageID.3101.)

- **Payment Terms**: "Net 45 days." (*Id.*, PageID.3094.)

- **Terms and Conditions**: The FPCM Purchase Order incorporated FCA's general terms and conditions (the "FCA Terms and Conditions"). More specifically, the FPCM Purchase Order provided that "Seller agrees to sell and deliver the goods or services specified in Chrysler's order in accordance with the terms and conditions contained in the order, including the clauses referenced in the order, the [FCA Terms and Conditions,] the terms of this form and any signed documents referenced in this order." (*Id.*) The FPCM Purchase Order then provided that its terms (that included the FCA Terms and Conditions) "constitute[d] the entire and final agreement of the parties and cancels and supersedes any prior or contemporaneous negotiation or agreement." (*Id.*) Finally, the FPCM Purchase Order stated that "[b]y accepting the order, seller acknowledges having actual knowledge of the text of the referenced clauses and the general terms and conditions." (*Id.*)

- **Forum-Selection Clause**: The FCA Terms and Conditions included a forum-selection clause requiring all litigation to be filed in a state or federal court having jurisdiction over Oakland County, Michigan. (*See* FCA Terms and Conditions § 26(b), ECF No. 114-3, PageID.3019.)

- **Method of Acceptance**: The FCA Terms and Conditions provided that a seller could accept a purchase order by written acknowledgement, performance, or delivery. (*See id.* § 2, PageID.3004.)
- **Rejection of Nartron's Terms and Conditions**: The FPCM Purchase Order provided that "Chrysler expressly limit[ed its] acceptance to the terms of the order and any additional or different terms, whether contained in seller's forms or otherwise presented by seller are rejected unless expressly agreed to by Chrysler." (FPCM Purchase Order, ECF No. 114-9, PageID.3094.)

FCA continued to issue amended purchase orders for the FPCMs in 2011 and 2012 as its relationship with Nartron progressed. (*See* Summary of Purchase Orders, ECF No. 114-11, PageID.3114–3115.)

On June 1, 2011, FCA issued a purchase order to Nartron for tooling (the "Tooling Purchase Order"). (*See* Tooling Purchase Order, ECF No. 114-12.) On July 11, 2011, FCA issued a purchase order to Nartron for engineering, research, and development (the "Engineering Purchase Order"). (*See* Engineering Purchase Order, ECF No. 114-13.) These two purchase orders, like the FPCM Purchase Order, incorporated the FCA Terms and Conditions and rejected Nartron's terms and conditions.[3] (*See* Tooling Purchase Order, ECF No. 114-12, PageID.3119; Engineering Purchase Order, ECF No. 114-13, PageID.3133.)

---

[3] The Court will refer to the FPCM Purchase Order, the Tooling Purchase Order, and the Engineering Purchase Order collectively as the "Purchase Orders." (*See* Mot. for Partial Summ. J., ECF No. 114, PageID.2952.)

## B

According to Synergen, Nartron "performed its obligations to Chrysler by designing the customized FPCM[s] and delivering 275,646 of those goods to Chrysler." (Compl. ¶¶ 5, ECF No. 1-1, PageID.8.) Syngeren contends, however, that in August 2013, FCA declined to pay Nartron for the FPCMs and "purported to cancel that contract on the pretext that Nartron had breached it in some unspecified manner." (*Id.* ¶¶ 42–45, PageID.18–19.)

On March 20, 2015, Nartron assigned to Synergen all of its claims against FCA "arising out of the sale of goods to [FCA] between November 2010 and August 2013, involving a customized [FPCM] that was produced for [FCA]." (Assignment, ECF No. 114-21, PageID.3193.) Synergen then filed this action in the Osceola County Circuit Court on March 27, 2015. (*See* Compl., ECF No. 1-1.) Synergen brings three claims against FCA – for breach of contract, promissory estoppel, and unjust enrichment – and seeks $17,712,829.46 in damages as well as interest, costs, and attorneys' fees. (*See id.* ¶¶ 40–56, PageID.18–20.) FCA removed the case to the District Court for the Western District of Michigan on May 29, 2015. (*See* Notice of Removal, ECF No. 1.)

On July 23, 2015, Synergen filed a Motion to Remand. (*See* Mot. to Remand, ECF No. 14, Case No. 15-cv-00545 (W.D. Mich. July 23, 2015).) Synergen argued

that the Western District lacked subject-matter jurisdiction over the action because there was no diversity between the parties. (*See id.*)

On September 30, 2015, FCA filed a third-party breach of contract complaint against Nartron. (*See* FCA's Third-Party Compl., ECF No. 3.) Nartron then moved to strike FCA's third-party complaint. (*See* Mot. to Strike Third-Party Compl., ECF No. 43, Case No. 15-cv-00545 (W.D. Mich. Jan. 15, 2016).)[4]

On January 21, 2016, with the above-described motions pending, FCA filed a Motion to Transfer Venue to the Eastern District of Michigan under 28 U.S.C. § 1404(a). (*See* Mot. to Trans. Venue, ECF No. 114-3.) In that motion, FCA contended, among other things, that it was moving "to enforce the applicable contract" between itself and Nartron. (*Id.*, PageID.2982.) More specifically, FCA argued that this action had to be litigated in the Eastern District because (1) the applicable contract consisted of the Purchase Orders, (2) the Purchase Orders incorporated the FCA Terms and Conditions, and (3) the FCA Terms and Conditions contained the forum-selection provision – described above – requiring litigation to be conducted in a court having jurisdiction over Oakland County (i.e., the Eastern District). (*See id.*, PageID.2984–2985.)

---

[4] FCA's third-party complaint against Nartron was later dismissed without prejudice. (*See* Stip. Order Dismissing Third-Party Compl., ECF No. 77.)

Nartron filed a perfunctory response to FCA's motion to transfer. (*See* Resp. to Mot. to Trans., ECF No. 114-5.) Nartron argued that the motion was "premature" and that the court should "decide whether it has subject matter jurisdiction before making a determination on venue." (*Id.*, PageID.3053.) Nartron also contended, in the alternative, that its motion to strike FCA's third-party complaint "should be decided before Chrysler's Motion to Transfer Venue, as the choice of venue provision on which Chrysler relies is only contained in the contract between Chrysler and Nartron. Therefore, if Nartron is not a party to this matter, the determination of whether venue should be transferred may change." (*Id.*, PageID.3054.) On February 9, 2016, the Western District denied Synergen's motion to remand and denied Nartron's motion to strike FCA's third-party complaint. (*See* Order, ECF No. 48, Case No. 15-cv-00545 (W.D. Mich. Feb. 9, 2016).)

On May 23, 2016, the Western District granted FCA's motion to transfer venue to the Eastern District of Michigan under 28 U.S.C. § 1404(a). (*See* Order on Mot. to Trans., ECF No. 4.) The Western District weighed multiple factors under § 1404(a), including FCA's forum-selection clause and which venue would be more convenient for the witnesses, and concluded that the Eastern District was the appropriate venue for the action:

> The forum-selection clause in the contract at issue (which is actually a bundle of contracts as described in [FCA's Motion to Transfer]), states that "[a]ny suit regarding or relating to this [purchase] Order may only be brought in

9

the state or federal court in and for Oakland County, Michigan, USA, which are the exclusive venue for any such suit. Nartron also "irrevocably consent[ed] to . . . personal jurisdiction" and "irrevocably waive[d] any claim . . . that proceedings brought in such courts have been brought in an inconvenient forum." The contract also has a choice of law clause stating that the contract "will be governed by . . . the laws of Michigan." Synergen was not a signatory to the contract, but Nartron attempted to assign its rights under the contract to Synergen.

\*\*\*

In this case, Chrysler and Nartron entered into a commercial transaction governed by terms of the above quoted contract. Both were sophisticated parties represented by counsel. The forum-selection clause selected a district that encompasses large Chrysler facilities and is in the same state as Nartron and Synergen. The forum-selection clause was presumably part of a negotiated bargain, and the interests of justice include encouraging parties to comply with their contractual obligations.

Even apart from the forum-selection clause, Chrysler has pointed out that many of its employees who are potential witnesses reside and work in the Eastern District of Michigan, making courts there a more convenient forum for a number of witnesses. Neither Nartron nor Synergen has rebutted this assertion or argued that a different forum would be more convenient for them.

Courts in the Eastern District of Michigan have personal jurisdiction over the parties and, per this Court's Order, subject-matter jurisdiction. Venue is proper in the Eastern District by the terms of the contract. The Court therefore finds that, with the forum-selection clause as a significant factor, the § 1404(a) analysis of convenience to parties and interests of justice indicates that transfer is appropriate in this case.

The next question is whether Synergen can be bound by a forum-selection clause in a contract it did not directly sign. The Court finds that it can because Synergen is "closely related" to the dispute. Synergen entered into an alleged assignment with Nartron for "all those claims . . . arising out of the sale of goods to Chrysler between November 2010 and August 2013, involving a customized [FPCM] that was produced for Chrysler." The Complaint discusses the sales made "pursuant to express agreements" and quotes extensively from the contract at issue. The record is not entirely clear on the matter, but Synergen and Nartron apparently have close links, and at one point were represented by common counsel. The assignment of contract rights may have taken place for strategic reasons. In these circumstances, the Court finds that Synergen is "closely related" to the contract dispute such that it is foreseeable that they would be bound by the forum-selection clause. Indeed, to find otherwise would invite parties to avoid forum-selection clauses by assigning away contract rights when the forum proves to be undesirable.

(*Id.*, PageID.72–75; citations omitted.) On May 24, 2016, the action was transferred to this Court.

## C

Currently before the Court is FCA's Motion for Partial Summary Judgment. (*See* Mot. for Partial Summ. J., ECF No. 114.) FCA seeks a ruling that the Purchase Orders, the FCA Terms and Conditions (which are incorporated into the Purchase Orders), "and the documents referenced therein, constitute the controlling contract." (*Id.*, PageID.2938.) More specifically, FCA argues that the contract between FCA and Nartron is comprised of the following documents:

(a) the [FPCM Purchase Order], any FCA US issued Purchase Order amendments / revisions, any FCA US-issued change notices related to the [FPCMs,] and FCA US-issued specifications related to the [FPCMs];

(b) the [FCA Terms and Conditions] and any documents referenced therein;

(c) the [Tooling Purchase Order]; and

(d) the Engineering [Purchase Order].

(*Id.*, PageID.2952.) Synergen opposes the motion. (*See* Resp. to Mot. for Partial Summ. J., ECF No. 115.)

The Court held a hearing on FCA's motion on December 5, 2019. (*See* Hr'g Tr., ECF No. 119.) Following the hearing, the parties submitted supplemental briefs. (*See* ECF Nos. 124, 126, 127, and 131.)

## II

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find

for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## III

FCA offers five arguments as to why its Purchase Orders (that incorporated the FCA Terms and Conditions) comprise the governing contract. None of the arguments persuade the Court to rule, as a matter of law, that the controlling contract consists of those documents.

## A

FCA first argues that the Western District has already definitively ruled that the governing contract consists of the Purchase Orders (that incorporated the FCA Terms and Conditions), and FCA insists that the Western District's ruling controls here under the law of the case doctrine. The Court disagrees.

The law of the case doctrine "states that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Moses v. Bus. Card. Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). The doctrine "is a rule of judicial comity rather than one of jurisdictional limitation;" it "does not limit

a court's power to make an independent decision" but rather "directs a court's discretion." *Id.* (quotation omitted). Accordingly, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona*, 460 U.S. at 618 n.8).

The Court declines to hold that the parameters of the governing contract may properly be determined by applying the law of the case doctrine. The doctrine does not control because the Western District did not squarely decide the precise legal question of which documents constitute the controlling contract. Instead, the Western District decided a different legal question: whether transfer to this Court under 28 U.S.C. § 1404(a) was appropriate. It is certainly true that in ruling on that question, the Western District appeared to accept FCA's – unchallenged – assertion that its Purchase Orders (that incorporated the FCA Terms and Conditions) made up the controlling contract. But the Western District did not undertake any independent analysis to determine whether those documents actually comprised the governing contract. Under these circumstances, the Court will not apply the law of the case doctrine so as to preclude Synergen from arguing that the governing contract consists of something other than the Purchase Orders (and the FCA Terms and Conditions).

Even if the Western District's decision could be read as having decided the precise question of which documents constitute the governing contract, the Court would still decline to give that ruling preclusive effect under the law of the case doctrine. Determining the parameters of the governing contract here is an exceedingly difficult task, and the Western District did not have before it complete briefing on this challenging question. Instead, as noted above, given the unusual procedural posture of the case – three competing motions pending at once with a request by Synergen that the court first focus on the motions that did not turn on which documents comprised the controlling contract – the court seemed to accept FCA's unchallenged assertion concerning the contents of the governing contract. This Court concludes that the determination of which documents comprise the governing contract is best made after full briefing and argument – from which this Court, unlike the Western District, has benefitted. For these reasons (and those above), the Court exercises its discretion not to apply the law of the case doctrine so as to bar Synergen from challenging FCA's contention as to which documents comprise the controlling contract.

**B**

Next, FCA argues that while this case was pending in the Western District, Nartron made a judicial admission that the governing contract consists of the Purchase Orders (that incorporated the FCA Terms and Conditions), and FCA says

that Synergen is bound by that admission. (*See* Mot. for Partial Summ. J., ECF No. 114, PageID.2957-2960.) The Court disagrees.

Judicial admissions of fact "in the pleadings are generally binding on the parties and the Court." *Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.*, 780 F.2d 549 (6th Cir. 1986) (quotation omitted). "In order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous." *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 528 (6th Cir. 2014) (quoting *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)).

FCA focuses on an alleged judicial admission in Nartron's response to FCA's motion to transfer venue. In that response, Nartron wrote that "the choice of venue provision on which Chrysler relies is only contained in the contract between Chrysler and Nartron." (Resp. to Mot. to Trans., ECF No. 114-5, PageID.3054.) FCA seizes on Nartron's reference to "the contract between Chrysler and Nartron." FCA insists that this reference is an acknowledgment that the Purchase Orders (that incorporated the FCA Terms and Conditions) comprise the governing contract. (*See* Mot. for Partial Summ. J., ECF No. 114, PageID.2958.)

The Court declines to treat Nartron's statement as a judicial admission that precludes Synergen from presenting its own arguments as to the contents of the governing contract. The statement is a minor fragment in an argument that was focused on the chronological order in which the Western District should take up the

pending motions, not on the contents of the governing contract. Simply put, the Court does not view the statement as the type of "deliberate, clear and unambiguous" admission that has preclusive effect as a judicial admission. *Lee*, 760 F.3d at 528. Accordingly, the statement does not preclude Synergen from offering its arguments concerning the terms of the governing contract.[5]

## C

FCA also argues that testimony by seven Nartron employees conclusively establishes that the governing contract consists of the Purchase Orders (that incorporated the FCA Terms and Conditions). According to FCA, those employees unambiguously admitted that the contract consists of those documents. (*See* Mot. for Partial Summ. J., ECF No. 114, PageID.2952–2954, 2962.) The Court disagrees.

The Court has carefully reviewed the testimony cited by FCA and concludes that the testimony, when construed in favor of Synergen (as it must be at this stage of the proceedings), does not amount to admissions that the Purchase Orders (that incorporated the FCA Terms and Conditions) constitute the governing contract.

---

[5] FCA also argues that because Synergen did not respond to FCA's motion to transfer venue to this Court, Synergen waived any argument that the governing contract is something other than the Purchase Orders (and the FCA Terms and Conditions). The Court declines to apply the waiver doctrine here because the Court does not believe that by failing to respond to that motion Synergen knowingly and intentionally relinquished its right to press its claims concerning the content of the governing contract. *See Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006) ("[W]aiver is the intentional relinquishment or abandonment of a known right." (quotation omitted)).

Instead, the testimony, when read in Synergen's favor, could be read, for instance, as expressing the witnesses' views that the Purchase Orders were acceptances of an offer made by Natron in the Quote. And if the employees were stating only that the Purchase Orders were acceptances of Nartron's offer, then they were not necessarily admitting that the terms of the governing contract could be determined from the Purchase Orders alone. For these reasons, the Court declines to hold that the testimony by the Natron employees establishes, as a matter of law, that the governing contract consists of the Purchase Orders (that incorporated the Terms and Conditions).

## D

FCA further argues that the Purchase Orders (that incorporated the FCA Terms and Conditions) constitute the governing contract because (1) the Purchase Orders were offers and (2) Nartron accepted those offers by performance. (*See* Mot. for Partial Summ. J., ECF No. 114, PageID.2960–2962.) FCA is not entitled to summary judgment on this basis because a reasonable jury could conclude, contrary to FCA's contention, that the Quote (from Natron), rather than the Purchase Orders, was the relevant offer. And if a jury so found, then it would not necessarily follow as a matter of law that the Purchase Orders (and the FCA Terms and Conditions) comprise the governing contract.

Because this action involves an agreement between two merchants for the sale of goods, it is governed by Article 2 of the Uniform Commercial Code (the "U.C.C."). *See* Mich. Comp. Laws §§ 440.2102, 440.2105(1); *see also Kvaerner U.S., Inc. v. Hakim Plast Co.*, 74 F. Supp. 2d 709, 712 (E.D. Mich. 1999). The U.C.C. does not define the term "offer," so "courts may look to sources such as the common law and the Restatement of Contracts for the definition." *LaForce, Inc. v. Pioneer Gen. Contractors, Inc.*, No. 299848, 2011 WL 4467762, at *4 (Mich. Ct. App. Sept. 27, 2011) (quotation omitted); *Foamade Indus. v. Visteon Corp.*, No. 271949, 2008 WL 582566, at *4 (Mich. Ct. App. Mar. 4, 2008).[6]

"An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it." *LaForce*, 2011 WL 4467762, at *4 (quoting *Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006)). And the offer must state "the essential terms with sufficient specificity that acceptance by another will conclude the bargain." *Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x 503, 506 (6th Cir. 2006) (citing *Challenge Mach. Co. v. Mattison Mach. Works*, 359 N.W.2d 232, 235 (Mich. Ct. app. 1984)).

---

[6] *See also Nordyne, Inc. v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir. 2001); *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F. Supp. 2d 643, 650 (E.D. Pa. 2002).

"Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (quoting *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190 (8th Cir. 1999)). And "a buyer's purchase agreement submitted in response to a price quotation is usually deemed the offer." *Id.*

Despite this general rule, "a price quotation may suffice for an offer if it is sufficiently detailed and it reasonably appear[s] from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract." *Id.* (quotation omitted). Courts examine "the totality of the circumstances" to determine whether a party's quotation was an offer. *Robert Bosch*, 195 F. App'x at 506. "[T]he inclusion of a description of the product, price, quantity, and terms of payment may indicate that the price quotation is an offer rather than a mere invitation to negotiate." *Dyno Constr.*, 198 F.3d at 572; *see also Robert Bosch*, 195 F. App'x at 506 ("Bosch's July 16, 2002 quotation specified price and quantity, among other things. . . . Thus, we agree with the district court that Bosch's July 16, 2002 quotation was an offer because it stated the essential terms . . . ."). Ultimately, "the determination of the issue depends primarily upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances." *Dyno Constr.*, 198 F.3d at 572.

A reasonable jury could find that Nartron's Quote was sufficiently detailed to constitute an offer. The Quote included a description of the product, price, quantity, and terms of payment. (*See* Quote, ECF No. 115-5, PageID.3251.) That is sufficient to support a finding that the Quote manifested Nartron's willingness to enter into a bargain and that FCA's assent to the bargain was invited and would conclude it. *See Dyno Constr.*, 198 F.3d at 572; *LaForce*, 2011 WL 4467762, at *4.

FCA counters that other elements of the Quote suggest it was not an offer. Among other things, FCA highlights that the Quote's terms were "subject to change based on the requirements of the final approved Chrysler specification." (*See* Mot. for Partial Summ. J., ECF No. 114, PageID.2963.) Therefore, FCA argues, the Quote "cannot be the final contract" because the "subject to change" language "would permit Nartron to change the estimate terms on a whim." (*Id.*, PageID.2963–2964.) But a reasonable jury could conclude that the "subject to change" language did not reserve for Nartron the unfettered discretion to change (or back out of) the deal. Instead, a jury could reasonably conclude that the Quote's language allowed Nartron to change its terms only if FCA changed the specifications it had provided.

FCA also contends that the initial Quote was a "springboard for further negotiation and discussion with FCA," rather than an offer, because Nartron issued revised quotations later in the negotiation process. (*See* Mot. for Partial Summ. J.,

ECF No. 114, PageID.2964.) And FCA further argues that the Quote was not an offer because it was labeled "Estimate," did not contain the word "offer," and did not include warranty information. (*See id.*, PageID.2967; FCA Supp. Br., ECF No. 124, PageID.3581–3582; citing *Dyno Constr.*, 198 F.3d at 573–74.) These are reasonable and serious arguments by FCA, and they may ultimately persuade a jury to find that the Quote was not an offer. But the arguments do not persuade the Court that it may hold, as a matter of law, that the Quote was not an offer.

In this regard, the Court notes that the Quote was far more detailed and definite than the quotes deemed to fall short of an offer in *Dyno Construction*. The quotes in that case were held to be mere invitations to negotiate because they did not state "the place of delivery, time of performance, or terms of payment," and one of the quotations had "Please call" printed on the cover sheet. *Dyno Constr.*, 198 F.3d at 574. The Quote, in contrast, did not ask FCA to contact Nartron for further negotiations and instead included payment terms as well as a detailed schedule for performance. (*See* Quote, ECF No. 115-5, PageID.3251–3253.) The Quote is also far more detailed than the quotation in another case that FCA relies on, *Audio Visual Associates v. Sharp Electronics Corp.*, which quoted a price but was silent regarding "quantity, delivery, and payment." 210 F.3d 254, 259 (4th Cir. 2000).

For all of these reasons, FCA is not entitled to partial summary judgment based on its argument that, as a matter of law, the Purchase Orders, rather than Nartron's Quote, were the offer.

**E**

Finally, FCA argues that even if the Quote from Nartron was an offer, the FPCM Purchase Order (that incorporated the FCA Terms and Conditions) still comprises the governing contract.[7] FCA contends that the FPCM Purchase Order was a counteroffer and that Nartron accepted the counteroffer by performing (i.e., by shipping products to FCA). Thus, according to FCA, the terms of the FPCM Purchase Order govern.

FCA offers two alternative theories as to how the FPCM Purchase Order constituted a counteroffer and how Nartron's performance amounted to acceptance of the counteroffer. But for the reasons explained below, on the record now before the Court, FCA is not entitled to summary judgment on either theory.

**1**

FCA argues that the FPCM Purchase Order was effectively a counteroffer because it "expressly limited acceptance to its terms." (FCA Supp. Br., ECF No.

_____

[7] In the sections above, the Court has referred to the "Purchase Orders" plural. In this section, the Court focuses solely on the FPCM Purchase Order because the argument by FCA that addresses this issue contends that the FPCM Purchase Order (singular) was a counteroffer. (*See* FCA Supp. Br., ECF No. 124, PageID.3594–3599.)

124, PageID.3598.)  In support of this argument, FCA invokes Section 2-207(1) of the U.C.C., Mich. Comp. Laws § 440.2207(1).  That statute provides in relevant part that a "definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms*."  Mich. Comp. Laws § 440.2207(1) (emphasis added).  FCA points to language in the FPCM Purchase Order that, it says, conditioned FCA's acceptance to the terms of that order (and no other terms), and FCA contends that in light of this language, the FPCM Purchase Order "could never operate as an acceptance of [the Quote], but would operate as a counteroffer as a matter of law."  (FCA Supp. Br., ECF No. 124, PageID.3598–3599.)  And FCA argues that Nartron then accepted the counteroffer in the FPCM Purchase Order – or, in the words of the U.C.C., that Nartron "assent[ed] to the additional or different terms" in the FPCM Purchase Order – by rendering performance.  The Court declines to grant summary judgment to FCA on this theory for two reasons.

First, FCA has not yet persuaded the Court that the language in the FPCM Purchase Order was sufficient to "condition acceptance" of Nartron's proposal on Nartron's assent to the different terms included in that order.  Courts applying Section 2-207(1) of the U.C.C. have found similar language insufficient to condition

an offeree's acceptance on the offeror's assent to the different provisions. *See, e.g.*, *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1164 (6th Cir. 1972); *Challenge Mach.*, 359 N.W.2d at 234. And FCA has not cited any decisions applying Michigan law in which the language used in the FPCM Purchase Order was deemed sufficient to "condition [the offeree's] acceptance" on the offeror's assent to additional or different terms.[8] Under these circumstances, the Court is unwilling to hold as a matter of law, at this point, that the language cited by FCA in the FPCM Purchase Order conditioned Chrysler's acceptance upon Nartron's assent to the differing terms in the purchase order and thereby converted the purchase order into a counteroffer.

Second (and in any event), even if the FPCM Purchase Order could be deemed a counteroffer under this theory, summary judgment would still be inappropriate

---

[8] One case that is potentially in FCA's favor is *Ralph Shrader, Inc. v. Diamond Int'l Corp.*, 833 F.2d 1210 (6th Cir. 1987). In *Ralph Shrader*, the Sixth Circuit found that the following contract language (which is arguably similar to the language in the FPCM Purchase Order) conditioned one party's acceptance on the other's assent to its additional terms: "The terms set forth on the reverse side are the only ones upon which we will accept orders." *Id.* at 1213. The court concluded that the party had clearly conditioned acceptance by "explicitly stat[ing] that plaintiff only accepts on the given terms." *Id.* at 1214–15. FCA, however, argued in its supplemental brief that *Ralph Shrader* had "no bearing on the present case." (FCA Supp. Resp. Br., ECF No. 127, PageID.3761.) Moreover, *Ralph Shrader* is distinguishable from this case because the counterofferor in *Ralph Shrader* required the buyer to "'advise . . . immediately' if anything in the acknowledgement form was found objectionable." 833 F.2d at 1215. FCA, in contrast, made no such indication that it was "unwilling to proceed unless assured of the offeror's assent to the additional or different terms." *Id.* at 1214 (citing *Challenge Mach.*, 359 N.W.2d at 235).

because FCA has not established as a matter of law that Nartron assented to the differing terms in the FPCM Purchase Order by supplying FPCMs. The Sixth Circuit has held "that 'assent' under Michigan law is a question for the trier of fact." *Ralph Shrader, Inc. v. Diamond Int'l Corp.*, 833 F.2d 1210, 1215 (6th Cir. 1987). And that court has held that where an offeror performs a contract after receiving an acceptance that is conditioned upon his assent to different terms, the performance, standing alone, does not compel the conclusion that the offeror assented to the different terms. *See id.* Other courts of appeals have reached the same conclusion. *See, e.g.*, *Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 189 (1st Cir. 1997); *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1443–40 (9th Cir. 1986). For these reasons, the Court declines to hold as a matter of law and on the current record that Nartron assented to the different terms in the FPCM Purchase Order when Nartron supplied the FPCMs to FCA.

**2**

FCA next argues that the FPCM Purchase Order was a counteroffer because the "dickered terms" in the purchase order materially differed from the "dickered terms" in the Quote.[9] (FCA Supp. Br., ECF No. 124, PageID.3593–3597.) According to FCA, the FPCM Purchase Order and the Quote conflicted with respect

---

[9] *See LaForce*, 2011 WL 4467762, at *5 (defining "dickered terms" as terms "that are unique to each transaction such as price, quality, quantity, or delivery terms" (quotation omitted)).

to quantity, price, delivery terms, payment terms, and duration. (*See id.*, PageID.3596–3597.) FCA insists that these conflicts compel the conclusion that the FPCM Purchase Order was a counteroffer as a matter of law, and FCA contends that Nartron's performance amounted to acceptance of this counteroffer as a matter of law.

While a purchase order may be a counteroffer where it materially conflicts with the dickered terms in a preceding quotation, *see LaForce*, 2011 WL 4467762, at *5, the Court declines to hold as a matter of law, on the current record, that the dickered terms of the FPCM Purchase Order so conflicted with the terms of the Quote that the FPCM Purchase Order must be regarded as a counteroffer.

Consider the dickered price term. The Quote listed an initial price of $11.82 per FPCM for the 2013 model year and then decreasing prices of $11.58 per FPCM for the 2014 model year and $11.35 per FPCM for the 2015 model year, whereas the Quote listed a constant price of $11.82 per FPCM. While it is true, as FCA notes, that these price terms differ, the difference is not necessarily one that should be deemed to convert the FPCM Purchase Order into a counteroffer. Indeed, FCA proposed to pay a *higher* price than Nartron sought in the Quote, and it would not make sense to treat that proposal as a counteroffer rejecting Nartron's offered pricing. By offering to pay a *higher* price, FCA was, at a minimum, *agreeing* to Natron's proposed price. Under these circumstances, the difference in the dickered

price term does not compel the conclusion that the FPCM Purchase Order was a counteroffer that effectively rejected the Quote. While FCA contends that there are material differences in other dickered terms besides price, the Court is unwilling to conclude on the current record that the alleged differences compel the conclusion as a matter of law that the FPCM Purchase Order was a counteroffer that rejected the Quote.[10]

Finally, even if the Court had concluded that the FPCM Purchase Order was a counteroffer on the difference-in-dickered-terms theory, the Court would not have granted summary judgment to FCA. That is because the Court declines to hold as a matter of law on the current record that Nartron accepted the counteroffer by performing. As set forth above, there is authority suggesting that whether performance amounts to assent to conflicting terms is a question of fact for the jury. *See Ralph Shrader*, 833 F.2d at 1215. There is additional authority that suggests that where an offeror makes an offer restricted to its own terms, receives a true counteroffer, and then renders performance, that performance, standing alone, does not necessarily amount to acceptance of the counteroffer as a matter of law. *See, e.g.*,

---

[10] To be fair to FCA, the Court should note that FCA explored and developed this argument when the Court raised it during the hearing on FCA's motion. The Court appreciates FCA's thorough development and careful presentation of this argument in its post-hearing briefing. Now that the Court has fully considered this argument, the Court has concluded that its initial inclination – that this argument may well be a winner for FCA at the summary judgment stage – was wrong.

*Ionics*, 110 F.3d at 189 ("[W]here the terms in two forms are contradictory, each party is assumed to object to the other party's conflicting clause. As a result, mere acceptance of the goods by the buyer is insufficient to infer consent to the seller's terms . . . ."); *Step-Saver Systs. v. Wyse Tech.*, 939 F.2d 91, 101 n.34 (3d Cir. 1991) (discussing a line of cases holding that where the parties' writings conflict and where "the sole evidence of assent to the terms of [a] counteroffer is from the conduct of the parties proceeding with the transaction, then the courts generally define the terms of the parties' agreement under 2-207(3)").[11] In light of this authority, and given the ambiguities in the current record surrounding performance and contract formation issues, the Court declines to hold as a matter of law that Nartron's performance amounted to acceptance of the FPCM Purchase Order.

## IV

Accordingly, for all the reasons explained above, FCA's Motion for Partial Summary Judgment (ECF No. 114) is **DENIED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 23, 2020

---

[11] *See also* 1 White, Summers, & Hillman, *Uniform Commercial Code* § 2:14 (6th ed. 2019 update) (explaining that performance by offeror who has received a document from offeree containing conflicting terms, standing alone, does not amount to acceptance of the conflicting terms); *Lorbrook Corp. v. G & T Indus., Inc.*, 162 A.D.2d 69, 74–75 (N.Y. App. Div. 1990).

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 23, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764